UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE PARISH OF JEFFERSON, | CIVIL ACTION NO.: |
| JEFFERSON PARISH HOSPITAL | |
| SERVICE DISTRICT NO. 1, AND | |
| JEFFERSON PARISH HOSPITAL | |
| SERVICE DISTRICT NO. 2 | SECTION: |
| | |
| VERSUS | |
| | JUDGE: |
| AMERISOURCEBERGEN DRUG | |
| CORPORATION, CARDINAL HEALTH, | |
| INC., McKESSON CORPORATION, | MAGISTRATE: |
| PURDUE PHARMA L.P., PURDUE | |
| PHARMA, INC., THE PURDUE | |
| FREDERICK COMPANY, INC., TEVA | |
| PHARMACEUTICAL INDUSTRIES, | |
| LTD., TEVA PHARMACEUTICALS USA, | |
| INC., CEPHALON, INC., JOHNSON & | |
| JOHNSON, JANSSEN PHARMACEUTICALS, | |
| INC., ORTHO-MCNEIL-JANSSEN | |
| PHARMACEUTICALS, INC. | |
| n/k/a JANSSEN PHARMACEUTICALS, INC., | |
| JANSSEN PHARMACEUTICA, INC. | |
| n/k/a JANSSEN PHARMACEUTICALS, INC., | |
| NORAMCO INC., ENDO HEALTH SOLUTIONS. | |
| INC., ENDO PHARMACEUTICALS, INC., | |
| ALLERGAN PLC f/k/a ACTAVIS PLC., | |
| WATSON PHARMACEUTICALS, INC., | |
| n/k/a ACTAVIS,INC., WATSON | |
| LABORATORIES, INC., ACTAVIS LLC., | |
| ACTAVIS PHARMA, INC. f/k/a WATSON | |
| PHARMA, INC., MALLINCKRODT PLC., | |
| AND MALLINCKRODT LLC. | |

## **COMPLAINT AND JURY DEMAND**

Plaintiffs, THE PARISH OF JEFFERSON, JEFFERSON PARISH HOSPITAL

SERVICE DISTRICT NO. 1, AND JEFFERSON PARISH HOSPITAL SERVICE

DISTRICT NO. 2 (hereinafter collectively referred to as "Jefferson Parish"), bring this

lawsuit against prescription opioid manufacturers and distributors to recover taxpayer

money and resources spent as a result of the opioid epidemic wreaking havoc on its community, its healthcare system and its judicial and criminal justice systems.

## INTRODUCTION

1.

It is estimated that opioids kill upwards of 100 Americans per day, and the opioid prescription costs and costs for treating the diseases and injuries caused by them is in the billions of dollars per year.

2.

The leading cause of death for Americans under the age of 50 is accidental drug overdose, two thirds of which are opioid related.

3.

Deaths caused by accidental drug overdoses, predominantly from opioids, exceed the number of deaths caused by guns or motor vehicle collisions.

4.

The Centers for Disease Control and Prevention has reported that the economic burden caused by opioid abuse in the United States is approximately $78.5 billion, including lost productivity and increased social services, health insurance costs, increased criminal justice presence and strain on judicial resources, substance abuse treatment and rehabilitation costs.

5.

Charged by law to monitor and report dangerous behavior associated with opioid use, opioid manufacturing and distributing companies instead systematically and

repeatedly disregarded the safety of their consumers and the public in favor of maximizing corporate profits and driving up their market share.

6.

Corporate greed and indifference to known, serious potential for human suffering have caused this public health crisis. Defendants helped to create a healthcare crisis that has had far-reaching financial, social, and deadly consequences in this country and in Jefferson Parish.

7.

For too long, the public at large has been forced to contend with the deadly aftermath of the proliferation of opioids in society. Those responsible should be required to absorb the costs with which they have burdened society.

8.

Defendants' deceptive marketing scheme rationalized prescribing opioids for chronic pain and opened the floodgates for opioid use and abuse.

9.

Defendants falsely and misleadingly downplayed the serious risk of addiction; advocated the use of more opioids to treat "pseudo-addiction;" exaggerated the effectiveness of screening tools in preventing addiction and the effectiveness of formulations to prevent abuse and addiction; claimed opioid dependence and withdrawal are easily managed and denied the risks of higher opioid dosages.

10.

In order to increase their market share and profits, Defendants knew that they would need to assuage doctors' fears associated with the dangers of long-term opioid

use and developed a deceptive marketing strategy to create a misperception in the medical community.

11.

Defendants falsely touted the benefits of long-term opioid use without any reliable, scientific evidence to support their claims.

12.

Defendants directly disseminated this false information through a common marketing message delivered by their sales representatives and physicians recruited by them.

13.

Defendants also worked through third parties known as key opinion leaders ("KOLs") and professional societies and patient advocacy groups ("Front Groups") to tout the benefits of opioids to treat chronic pain.  Working individually and collectively through these KOLs and Front Groups, Defendants persuaded doctors and patients that the long-held belief that opioids were addictive, if used long term, was false.

14.

Defendants, collectively and individually, poured huge sums of money into generating articles, creating continuing medical education courses and other "educational" materials, conducting sales visits to individual doctors, and supporting a network of professional societies and advocacy groups, with the intention of creating a bogus "consensus" of support for the use of opioids to treat chronic pain.

4

15.

Each Defendant knew that its misrepresentations of the risks and benefits of opioids were not supported by, or were directly contrary to scientific evidence, as confirmed by the U.S. Food and Drug Administration ("FDA") and the Centers for Disease Control and Prevention ("CDC").

16.

Defendants' efforts were highly profitable.  Opioids are now the most prescribed class of drugs generating $11 billion in revenue for drug companies in 2014 alone.

17.

The National Institutes of Health ("NIH") identifies Defendants' "aggressive marketing" as a major cause of the opioid epidemic in this country.  America's Addiction to Opioids: Heroin and Prescription Drug Abuse.[1]

18.

This epidemic has resulted in a flood of prescription opioids both prescribed by physicians and available for illicit use or sale, and a population of patients physically and psychologically dependent on them.  When patients can no longer afford or legitimately obtain opioids to which they have become addicted, they often turn to the street to buy opioids or heroin.  The CDC estimates that approximately three out of four new heroin addicts in the United States started by abusing prescription opioids.  See Heroin    Overdose    Data,    Centers    for    Disease    Control    &    Prevention,

---

[1]http://www.drugabuse.gov/about-nida/legislative-activities/testimony-to-congress/2015/americas'additction-to-opioids-heroin-prescription-drug-abuse#_ftn2 (accessed August 18, 2017).

https://www.cdc.gov/drugoverdose/data/heroin.html.

## JURISDICTION AND VENUE

19.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on federal claims asserted under 18 U.S.C. § 1961, *et seq.,* and other federal and state laws, for actions under the Racketeer Influenced and Corrupt Organizations Act ("RICO").   Plaintiff seeks declaratory and injunctive relief, actual, consequential, treble, and exemplary damages, and all other relief this Honorable Court deems just and proper. The basis of this civil action is a widespread criminal *enterprise* through which Defendants engaged in a *pattern of racketeering activity* across State lines, including through and across Louisiana state lines (including through and across the boundaries of Jefferson Parish), and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts, as set forth more fully below. Moreover, Defendants' distribution and diversion of opioids into Louisiana, and into the Parish of Jefferson and surrounding areas, created the foreseeable opioid crisis and opioid public nuisance from which Plaintiffs seek relief.

20.

In addition, federal subject matter jurisdiction in the constituent actions is based upon 28 U.S.C. § 1332 in that in each of the constituent actions there is complete diversity of citizenship among Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

21.

The Court has personal jurisdiction over Defendants because at all relevant times Defendants engaged in substantial business activities in the State of Louisiana, purposefully directed their actions toward Louisiana and its Parishes, consensually submitted to the jurisdiction of Louisiana when obtaining a manufacturer or distributor license and have the requisite minimum contacts with Louisiana necessary to constitutionally permit the Court to exercise jurisdiction.  This Court may exercise nation-wide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiffs demonstrate national contacts.  Here, the interests of justice require that Plaintiffs be allowed to bring all members of the nationwide RICO enterprise before the court in a single trial. Moreover, Defendants' actions and/or inactions described herein were purposefully directed at and/or within the State of Louisiana and the Parish of Jefferson, the damages were sustained by Plaintiffs within the State of Louisiana and the Parish of Jefferson, and the damages sustained by Plaintiffs were a result of Defendants' actions and/or inactions described herein that were purposefully directed at and/or within the State of Louisiana and the Parish of Jefferson.

22.

Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and each Defendant transacted affairs and conducted activity that gives rise to the claims for relief in this District.  Moreover, Plaintiffs are located in this District.

7

**PARTIES**

23.

Plaintiffs Jefferson Parish, a political subdivision of the State of Louisiana,  by and through its pre-1974 Home Rule Charter, the Jefferson Parish Hospital Service District No. 1, and the Jefferson Parish Hospital Service District No. 2, bring this civil action against Defendants  for operating a continuous criminal enterprise in violation  of federal and state law, and to eliminate  the hazard to public health and safety caused by the opioid epidemic, to abate its nuisance, and to recoup monies spent because of Defendants' false, deceptive, and/or  unfair  marketing  scheme and unlawful distribution of dangerous prescription opioids.  Jefferson Parish is located within this District and has a population of over 430,000 people.  The Parish is at the center of the rising opioid epidemic in the United States, and it has incurred staggering costs and loss of resources attempting to curb the epidemic.

Plaintiffs have standing to recover damages incurred as a result of Defendants' actions and omissions. Plaintiffs have standing to bring all claims herein including, *inter alia,* standing to recover damages caused by a criminal act; standing to recover damages under the Louisiana Unfair Trade Practices Act; standing to bring claims under the Louisiana racketeering statute; and standing to bring claims under the federal RICO statute, pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. § 1964 ("persons" have standing).

Plaintiffs sustained all economic damages alleged herein and will continue to sustain damages for the foreseeable future.   Defendants' conduct has created a financial burden for which the Plaintiffs seek relief.  Categories of past and continuing sustained damages include, *inter alia:* (1) costs for providing treatment  for individuals  suffering

from opioid-related addiction or disease;  (2) costs for providing counseling and rehabilitation services for individuals suffering from opioid-related addiction or disease; (3) criminal justice costs associated with the opioid epidemic to include the judicial system, prosecution, home incarceration costs, jail costs, jail medical costs, juvenile services, juvenile detention costs and juvenile detention medical costs; (4) judicial system costs and incarceration costs for opioid-related crime; (5) opioid related emergency room and/or hospital costs, ambulance, and fire service costs; (6) costs related to opioid and opioid-related overdoses and death investigations; (7) lost productivity costs due to employee absenteeism related to opioid addiction or disease; (8) any and all other costs and expenses incurred by Plaintiffs directly or indirectly due to Defendants' conduct.  These damages have been suffered, and continue to be suffered, by the Plaintiffs.

Plaintiffs also seek the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct. Plaintiff, the Parish of Jefferson, is authorized by law to abate any nuisance and prosecute in any court of competent jurisdiction any person who creates, continues, contributes to, or causes such nuisance to exist and prevent injury and annoyance from such nuisance.

24.

The defendants named herein are:

**a.      Manufacturer Defendants.**

At all relevant times, Manufacturer Defendants packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and/or purported to warn, or purported to inform, the medical community, treating

9

physicians, prescribers, the public, consumers, and/or users regarding the benefits and risks associated with the use of prescription opioid drugs. At all times, Manufacturer Defendants manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

25.

PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware. PURDUE PHARMA INC. is a New York corporation with its principal place of business in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue"). Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin,  MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER and Targiniq ER in the United States, including within all parts of the State of Louisiana, the Parish of Jefferson, and within this judicial district.

OxyContin is Purdue's largest-selling opioid.  Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $3.1 billion, having quadrupled from $800 million in 2006.  OxyContin constitutes roughly 30% of the entire market for analgesic drugs.

26.

CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc. TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a Delaware corporation and is a wholly-owned subsidiary of Teva Ltd.

in Pennsylvania. Teva USA acquired Cephalon in October 2011.

Cephalon, Inc. manufactures, promotes, sells and distributes opioids such as Actiq and Fentora in the United States, including within all parts of the State of Louisiana, the Parish of Jefferson, and within this judicial district. Actiq has been approved by the FDA only for the management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain.  Fentora has been approved by the FDA only for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain.

Teva Ltd., Teva USA and Cephalon, Inc. work together (and at all times relevant herein have worked together) closely to market and sell Cephalon products in the United States. Upon information and belief, Teva Ltd. conducts all sales and marketing activities for Cephalon in the United States, including within all parts of the State of Louisiana, the Parish of Jefferson, and within this judicial district, through Teva USA and has done so since its October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the medical community, treating physicians, consumers, the public, and/or end users. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that Teva USA submitted the guide, and directs physicians to contact Teva USA to report adverse events.

Upon information and belief, all of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo.  Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012, just one year after its Cephalon acquisition, attributed a 22% increase in its specialty medicine sales to "the inclusion  of a full  year of Cephalon's  specialty sales," including,  *inter alia,* sales  of Fentora®.

Through interrelated operations like these, Teva Ltd. operates in the United States through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder.  Teva Pharmaceutical Industries, Ltd.; Teva Pharmaceuticals USA, Inc. and Cephalon, Inc. are referred to as "Cephalon."

27.

JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in  New Brunswick,  New Jersey. NORAMCO,  INC.  ("Noramco")  is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary  of  J&J  until  July  2016.  ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS,  INC.,  now  known  as  JANSSEN  PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in  Titusville,

New Jersey. JANSSEN PHARMACEUTICAL INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and J&J corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sales and development of Janssen Pharmaceuticals' drugs, and Janssen's profits inure to J&J's benefit.  Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., Noramco, and J&J are herein referred to as "Janssen."

Janssen manufactures, promotes, sells and distributes drugs in the United States, throughout Louisiana, throughout Jefferson Parish, and throughout this judicial  district, including the opioid Duragesic (fentanyl). Upon information and belief, before 2009, Duragesic  accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed,  and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

28.

ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a wholly- owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation, with its principal place of business in Malvern, Pennsylvania. Endo Health Solutions Inc., and Endo Pharmaceuticals Inc., are herein referred to as "Endo."

 Endo develops, markets and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet and Zydone, in the United States, including in the State of Louisiana, Parish of Jefferson, and this judicial district. Upon information and

belief, opioids made up roughly $403 million of Endo's overall revenues of around $3 billion in 2012. Opana ER yielded revenue of $1.15 billion from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, both directly and through its subsidiary, Qualitest Pharmaceuticals, Inc.

29.

ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired Allergan PLC in March 2015, and the combined company changed its name to ALLERGAN PLC. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and the combined company changed its name to ACTAVIS, INC. as of January 2013 and then ACTAVIS PLC in October 2013.

WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).

ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is registered to do business with the Louisiana Secretary of State as a Delaware corporation with its principal place of business in New Jersey and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis Pharma, Inc. and Watson Pharma, Inc. are owned by Allergan plc, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan plc exercises control over these marketing and

sales efforts, and profits from the sale of Allergan/Actavis products ultimately inure to its benefit.  Allergan plc Actavis plc ; Actavis, Inc.; Actavis LLC; Actavis Pharma, Inc.; Watson Pharmaceuticals, Inc.; Watson Pharma, Inc.; and Watson Laboratories, Inc. are herein referred to as "Actavis."

Actavis manufactures, promotes, sells and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian and generic versions of Duragesic and Opana, in the United States, including throughout the State of Louisiana, the Parish of Jefferson, and within this judicial district. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008 and began marketing Kadian in 2009.

30.

MALLINCKRODT, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri. MALLINCKRODT, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Mallinckrodt, LLC is a wholly owned subsidiary of Mallinckrodt, PLC, and Mallinckrodt, PLC and Mallinckrodt, LLC are referred to as "Mallinckrodt."

Mallinckrodt manufactures, markets and sells drugs in the United States, the State of Louisiana, the Parish of Jefferson, and this judicial district, including generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.

31.

**b.    Distributor Defendants.**

The Distributor Defendants are defined below. At all relevant times, the Distributor Defendants have distributed, supplied, sold and placed into the stream of commerce prescription opioids without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes. The Distributor Defendants universally failed to comply with federal and/or state law. The Distributor Defendants are engaged in "wholesale distribution" as defined under law. Plaintiffs allege the unlawful conduct by Distributor Defendants is responsible for the volume of prescription opioids plaguing the United States, the State of Louisiana, the Parish of Jefferson, and this judicial district.

32.

Defendant, McKESSON CORPORATION, is registered with the Louisiana Secretary of State as a Delaware corporation, which may be served through its registered agent for service of process, Corporation Service Company 501 Louisiana Avenue, Baton Rouge, LA 70802. McKesson has its principal place of business located in San Francisco, California. At all relevant times, McKESSON CORPORATION operated as a licensed pharmacy wholesaler throughout the United States, including in Louisiana.

33.

Defendant, CARDINAL HEALTH, INC., is an Ohio corporation with its principal office located in Dublin, Ohio and may be served through its registered agent for service of process, CT Corporation System, 3867 Plaza Tower Dr., Baton Rouge,

LA 70816. At all relevant times, CARDINAL HEALTH, INC. operated as a licensed pharmacy wholesaler throughout the United States, including in Louisiana.

34.

Defendant, AMERISOURCEBERGEN DRUG CORPORATION ("AMERISOURCEBERGEN"), is registered with the Louisiana Secretary of State as a Delaware corporation, which may be served through its registered agent for service of process, CT Corporation System, 3867 Plaza Tower Dr., Baton Rouge, LA 70816. AmerisourceBergen Drug Corporation's principal place of business is located in Chesterbrook, Pennsylvania. At all relevant times, AMERISOURCEBERGEN operated as a licensed pharmacy wholesaler throughout the United States, including in Louisiana.

35.

Plaintiffs assert that McKesson Corporation, Cardinal Health and AmerisourceBergen Drug Corporation (the "Big 3"), upon information and belief, dominate 85% of the market share for the distribution of prescription opioids. The "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange, whose principal business is the nationwide wholesale distribution of prescription drugs. *See Fed. Trade Comm 'n v. Cardinal Health, Inc.,* 12 F. Supp. 2d 34, 37 (D.D.C. 1998). Each has been investigated and/or fined by the DEA for the failure to report suspicious orders. Plaintiffs have reason to believe each has engaged in unlawful conduct resulting in the diversion of prescription opioids into its community and that discovery will likely reveal others who likewise engaged in unlawful conduct. Plaintiffs name each of the "Big 3" herein as defendants and place the industry on notice that the Plaintiffs are acting to abate the public nuisance plaguing the Parish of Jefferson.

17

## FACTUAL ALLEGATIONS COMMON TO
## ALL COUNTS AND ALL DEFENDANTS

36.

While these Defendants may operate seemingly legitimate organizations and businesses, the facts alleged herein establish that these organizations and businesses conducted concerted activities for illegal purposes in violation of federal and state RICO statutes, and other federal and state laws. The pattern of illegal activities committed by the Defendants, the predicate acts described herein and discussed below, were done for the purpose of financial gain and were done continuously over numerous years and continue to this day.  By the acts alleged herein, Defendants, jointly and severally, aided, abetted and conspired to violate RICO and other laws, through their ongoing criminal enterprise.

37.

Before the l990s, accepted standards of medical practice dictated that opioid analgesic pain relievers should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative ("hospice" or "end-of-life") care. This is because opioid analgesic pain relievers did not improve patients' ability to overcome pain and function, and there was evidence of greater pain complaints as patients developed tolerance to opioids over time. The serious risk of addiction and other negative side effects discouraged or prohibited their use.

38.

Defendants developed a well-funded marketing scheme to take advantage of the lucrative chronic-pain patient market throughout the nation, the State of Louisiana, the Parish of Jefferson, and this judicial district. Defendants used both direct marketing and

18

unbranded advertising through seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use. These unsupported, deceptive statements were contrary to scientific evidence and contrary to pronouncements and guidance from the FDA and CDC.   Compounding the issue, Defendants targeted susceptible prescribers and vulnerable patient populations.

39.

Defendants spread their false and deceptive statements by marketing their branded opioid analgesic pain relievers directly to doctors and patients in Louisiana, including within the Parish of Jefferson, and this judicial district. Defendants also deployed what appeared to be unbiased and independent third-parties to spread their false and deceptive statements throughout Louisiana, including within the Parish of Jefferson, and this judicial district, that opioids would provide long-term pain relief and functional improvement, when in fact they controlled these third parties.

40.

Defendants also promoted the use of opioids for chronic pain through "detailers" (sales representatives who visited individual doctors and medical staff in their offices) and small-group speaker programs. Defendants have not corrected this misinformation. Each Defendant devoted and continues to devote massive resources to direct sales contacts with doctors, including doctors within the State of Louisiana, the Parish of Jefferson, and this judicial district.

41.

Defendants also paid doctors to serve on their speakers' bureaus and to attend programs with speakers, to include meals that were paid for by various Defendants.

Speaker programs provided: (I) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. The speakers gave the false impression that they were providing unbiased and medically accurate information when, in fact, they presented a script/common message prepared by Defendants. Upon information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

42.

Defendants employed the same marketing plans and strategies, and deployed the same messages in Louisiana, the Parish of Jefferson, and this judicial district, as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that Defendants' targeted messages are accurately and consistently delivered across marketing channels (including detailing visits, speaker events, and advertising) and in each sales territory. It includes national and regional sales representative training; national training of local medical liaisons; company employees respond to physician inquiries; centralized speaker training; single sets of visual aids; speaker slide decks, and sales training materials; and nationally coordinated advertising.

43.

Defendants also deceptively marketed opioids in Louisiana, the Parish of Jefferson, and this judicial district, through unbranded advertising that promotes opioid use generally,

but does not name a specific opioid. This advertising was ostensibly created and disseminated by independent third parties. Defendants controlled the deceptive messages put out by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain by funding, directing, reviewing, editing, and distributing this unbranded advertising. Defendants similarly controlled the distribution of these messages in scientific publications, treatment guidelines, continuing medical education events ("CMEs"), and medical conferences, and seminars. To this end, Defendants used third-party public relations firms to help control the messages of these third parties.

44.

Defendants also marketed unbranded advertising through third parties in order to avoid the regulatory scrutiny of the FDA typically associated with branded advertising. Defendants funded, directed, and controlled these third parties to conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain. This deceptive, unbranded marketing often contradicted the information they provided in their branded materials and reviewed by the FDA.

45.

Defendants utilized a small circle of doctors who, upon information and belief, were selected, funded, and elevated because of their public positions supporting the use of opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs."

46.

Defendants paid KOLs to serve as consultants, or on their advisory boards, and

to give talks or present CMEs. Defendants' KOLs gave promotional speeches, wrote, consulted on, edited, and allowed the use of their names to books and articles supporting the use of opioids for long-term treatment of chronic pain.  Defendants created opportunities for KOLs to participate in research studies suggested or chosen by the Defendants, and then cited and promoted favorable studies or articles by their KOLs. By contrast, Defendants did not support, acknowledge, or disseminate doctor publications unsupportive or critical of chronic opioid therapy.

47.

In fact, Defendants worked to not only create and promote favorable studies in the literature, but they worked to discredit or suppress negative information.  Defendants' studies and articles often targeted articles that contradicted Defendants' claims or raised concerns about chronic opioid therapy.  With the help of third party consultants, Defendants used negative review articles, letters to the editor, commentaries, case-study reports and newsletters to get their message out.

48.

Defendants' KOLs also served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain, and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Defendants were able to direct and exert control over each of these activities through their KOLs.

49.

Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for treating chronic

pain. Under the Defendants' direction and control, these "Front Groups" generated treatment guidelines, unbranded materials, and programs favoring chronic opioid therapy. They assisted Defendants by responding to negative articles, by advocating against regulatory changes that would limit prescribing opioids in accordance with scientific evidence and conducted research to the vulnerable patient populations targeted by Defendants.

50.

Defendants funded these Front Groups and exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content and by funding their dissemination. In doing so, Defendants ensured the Front Groups would generate only the messages Defendants wanted to distribute.

51.

These Front Groups include the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), Pain & Policy Studies Group ("PPSG"), and American Pain Foundation ("APF").

52.

APF published articles to be read by doctors, patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. The articles misrepresented the effects of tapering on opioid dependence and misrepresented that doctors could increase opioid dosages indefinitely without added risk.  The articles further misrepresented that long-term opioid use improved patients' function and quality of life. APF also launched a

23

campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes, including death, among returning soldiers. APF also engaged in a significant multimedia campaign through radio, television and the internet, to educate patients about their right to opioids for the treatment of pain. All of these programs were available nationally and were intended to reach Louisiana residents, Jefferson Parish residents, and residents of this judicial district.

53.

The APF was often called upon to provide "patient representatives" for Defendants' promotional activities. Defendants paid the APF to promote, market, and legitimize widespread opioid use throughout the nation.

54.

The American Academy of Pain Medicine ("AAPM") issued treatment guidelines and hosted various medical education programs essential to Defendants' deceptive marketing of chronic opioid therapy. For these efforts, opioid manufacturers paid AAPM millions of dollars and provided its members with numerous benefits.

55.

Treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy. Doctors, especially general practitioners and family doctors targeted by Defendants, who are neither experts nor trained in the treatment of chronic pain, rely on treatment guidelines. Treatment guidelines not only directly informed doctors' prescribing practices, but also are cited throughout the scientific literature and referenced by third-party payers in determining whether they should cover treatments for specific indications.

56.

In or about 1997, the AAPM and the APS issued a consensus statement, The *Use of Opioids for the Treatment of Chronic Pain,* which endorsed opioids to treat chronic pain and claimed that the risk of addiction to patients using them was low.

57.

The AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain. Upon information and belief, numerous panel members who drafted the AAPM/APS Guidelines received financial support from various Defendants.

58.

The 2009 Guidelines also promote opioids as "safe and effective" for treating chronic pain and concluded that the risk of addiction is manageable for patients regardless of past abuse histories. These AAPM/APS Guidelines have been a particularly effective channel of deception and influenced not only treating physicians but also the body of scientific evidence on opioids. Notably, the AAPM/APS Guidelines have been cited hundreds of times in academic literature, and were disseminated in Louisiana, Jefferson Parish, and in this judicial district, at all times relevant herein, without defendants disclosing the acknowledged lack of evidence to support them.

59.

To convince doctors and patients throughout the United States, including in Louisiana, Jefferson Parish, and in this judicial district, that opioids can and should be used to treat chronic pain, Defendants had to convince them that long-term opioid use is

both safe and helpful.  In order to do so, Defendants made claims that were not supported by, were contrary to, the scientific evidence.  Further, even though evidence-based pronouncements by and guidelines from the FDA and the CDC confirmed Defendants' claims were false and deceptive, Defendants have not corrected them, they have not instructed their KOLs or Front Groups to correct them, and they continue to spread them.

60.

Defendants' false claims and misrepresentations are contrary to longstanding scientific evidence. As noted in the CDC Guidelines endorsed by the FDA, there is "extensive evidence" of the possible harms of opioids, including having a "high potential for abuse," and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non- opioid drugs have failed. The FDA has further acknowledged that the risk is not limited to patients who seek drugs illicitly.

61.

Despite warnings from the FDA, Defendants falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudo-addiction." Defendants falsely claimed that pseudo-addiction is substantiated by

26

scientific evidence.

62.

CDC Guidelines reject the concept of pseudo-addiction and instead explain that "patients who do not experience clinically meaningful pain relief early in treatment... are unlikely to experience pain relief with longer-term use," and that physicians should "reassess" pain and function within 1 month" in order to decide whether to "minimize the risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

63.

Defendants also falsely instructed doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients and allowed patients to feel more comfortable starting on opioid therapy for chronic pain.

64.

CDC Guidelines confirm the falsity of these aforementioned misrepresentations by Defendants. The CDC Guidelines note that there are no studies assessing the effectiveness of risk mitigation strategies, such as screening tools, patient contracts, urine drug testing, or pill counts (widely misunderstood by doctors to detect and deter abuse), "for improving outcomes related to overdose, addiction, abuse, or misuse." As a result,

the CDC Guidelines recognize that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsel that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

65.

To downplay the risks and calm doctors' fears, Defendants falsely claimed the effectiveness of tapering on opioid dependence and grossly understated the difficulty of tapering.

66.

Defendants also deceptively minimized the significant symptoms of opioid withdrawal which include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia, spontaneous abortion and premature labor in pregnant women, depression, and addiction.  The CDC Guidelines recognize that the duration of opioid use and the dosage of opioids prescribed should be "limited" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms" because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The CDC Guidelines further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause and restart" tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are

discontinued."

67.

Defendants also falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance to lower dosages.

68.

As confirmed by the FDA and CDC, Defendants' claims conflict with available scientific evidence. As the CDC explained in its Guidelines, the "benefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage."  The CDC further explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC adds that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages." Accordingly, the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day. These findings reinforced earlier findings announced by the FDA.

69.

Finally, Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids created false impressions that these opioids can curb addiction and abuse.

70.

These numerous, longstanding misrepresentations of the risks of long-term

29

opioid use successfully convinced doctors and patients to discount those risks.

71.

In addition to minimizing the risks of long-term opioid therapy, Defendants grossly overstated the benefits of such "therapy." Various Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence. Not only have these Defendants failed to correct these false and deceptive claims, they continue to make them.

72.

Contrary to Defendants' claims, the CDC Guidelines approved by the FDA concluded that "there is no good evidence that opioids improve pain or function with long-term use, and ... complete relief of pain is unlikely."

73.

Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products such as non-steroidal anti-inflammatory drugs ("NSAIDS") so that doctors and patients would, instead, use opioids to treat chronic pain. These misrepresentations by Defendants are contrary to the evidence-based pronouncements by and guidance from the FDA and CDC. The FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." The CDC Guidelines further state that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

74.

Defendants misleadingly promoted their opioids as:

30

(a)      being unique among opioids in providing 12 continuous hours of pain relief with one dose despite knowing that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial number" of chronic pain patients taking OxyContin experience it. This makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence;

(b)      appropriate "therapy" for chronic pain even though the FDA expressly limited the use of opioids to the treatment of cancer pain in opioid-tolerant individuals. Upon information and belief, both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither drug is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events." The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.

31

75.

Defendants' deceptive marketing gave doctors and patients the false impression that opioids were not only safe and effective for treating chronic pain but were also approved by the FDA for such uses.

76.

Defendants unlawfu1y and unfairly failed to report or address the illicit and unlawful prescribing of their drugs, despite knowing about it for years. Upon information and belief, various Defendants' sales representatives have maintained a database of doctors suspected of inappropriately prescribing their drugs. Rather than report these doctors to state medical boards or law enforcement authorities and/or cease marketing to them, they used the list to demonstrate the high rate of diversion of OxyContin (the same OxyContin promoted as less addictive) in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug.

77.

Defendants have been cited for failure to set up an effective system for identifying and reporting suspicious prescribing. These Defendants failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct caused them to be placed on a no-call list.

78.

Defendants also targeted the elderly and veteran patient populations who tend to suffer from chronic pain.  Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the CDC Guidelines observe that existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions and recommends that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. The same holds true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post- traumatic stress disorder, which interact dangerously with opioids.

79.

Defendants made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience over the last 20 years, establishes that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. Upon information and belief, the FDA and other regulatory bodies warned Defendants of these adverse outcomes, and Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths, all of which made clear the harm caused by long-term opioid use.

80.

Defendants fraudulently concealed the harms of opioids.  At all times relevant to this Complaint, various Defendants took steps to avoid detection and fraudulently concealed their deceptive marketing practices through their work via third party Front Groups and KOLs.

81.

Defendants manipulated their promotional materials and distorted the scientific literature to falsely appear legitimate and scientifically supported.

82.

Due to Defendants' concealment and industry-wide fraud, Plaintiffs did not know of the existence or scope of its claims and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

83.

Defendants' deceptive marketing scheme caused and continues to cause doctors in Louisiana, Jefferson Parish, and this judicial district, to prescribe opioids for chronic pain conditions. Absent Defendants' deceptive marketing scheme, these doctors would not have prescribed as many opioids. Defendants' deceptive marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective. Absent Defendants' deceptive marketing scheme, far fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

84.

The escalating number of opioid prescriptions written by doctors who were deceived by Defendants' deceptive marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the United States, Louisiana, Jefferson Parish, and this judicial district.

85.

The CDC has explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses. See Heroin Overdose Data, Centers for Disease Control & Prevention, https://www.cdc.gov/drugoverdose/data/heroin.html.  For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity." Most opioid addiction begins with legitimately prescribed opioids, and therefore the opioid crisis could have been prevented but for Defendants' misrepresentations.

86.

Defendants' deceptive marketing scheme and other unlawful and unfair conduct resulted in the available opioid market and crisis which significantly harmed Plaintiffs and other communities throughout Louisiana, including in this judicial district. Defendants' success in extending the market for opioids to treat chronic pain fueled the crisis of addiction and its aftermath.

87.

By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month. By 2011, the CDC declared prescription painkiller overdoses to be at epidemic levels. The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population.  Meanwhile, Defendants collect billions of dollars in revenue from the addiction epidemic, while public entities experience tens of millions of dollars in injury caused by the reasonably foreseeable consequence of the crisis caused by the prescription of opioids, their misuse and addiction.

88.

Local governments, including the Parish of Jefferson, face a massive crisis in their struggle to deal with this expanding epidemic of opioid misuse and addiction. It is a serious national crisis that affects public health as well as social and economic welfare. Upon information and belief, the economic burden alone is $78.5 billion a year, and it includes healthcare costs, lost productivity, addiction treatment, and criminal justice expenses. Some of the repercussions for individuals include unemployment, both physical and mental health problems, homelessness, and incarceration.

89.

Local law enforcement agencies are faced with increases in opioid-related crime as a result of the crisis to include doctor shopping; forged prescriptions; falsified pharmacy records; employee theft; and a growing trend of crimes against pharmacies including robbery and burglary.

90.

Defendants knew and should have known about the harms their wrongful conduct caused. Defendants closely monitored their sales and prescribing doctor habits. Their sales representatives, who visited doctors and attended CMEs, knew which doctors were receiving their messages and how they were responding. Defendants also had access to and monitored government data, and other data, that tracked the explosive rise in opioid use, addiction, injury, and death. They knew and intended that their misrepresentations would persuade doctors to prescribe, and patients to use, their opioids for chronic pain.

91.

Defendants' deceptive marketing scheme and messaging tainted virtually every source doctors could rely on for information thereby preventing them from making informed treatment decisions. Moreover, Defendants promoted their products as medical breakthroughs to persuade doctors who wanted to believe they were providing their patients with compassionate and safe care.

92.

Jefferson Parish has incurred and continues to incur significant costs for treatment of opioid use and dependence.

93.

The Distributor Defendants owe a duty under both federal law (21 U.S.C. § 823, 21 CFR 1301.74), and Louisiana law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from the State of Louisiana, including Jefferson Parish and this judicial district, as well as those suspicious orders the

37

Distributor Defendants knew or should have known were likely to be diverted into the State of Louisiana, including Jefferson Parish and this judicial district. The foreseeable harm is the unlawful diversion of prescription opioids for nonmedical purposes.

94.

The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity, and mortality in the State of Louisiana, Jefferson Parish, and this judicial district. This diversion and the epidemic are direct causes of harms for which Plaintiffs seek to recover.

95.

The opioid epidemic in Louisiana, including in the Parish of Jefferson and this judicial district, remains an immediate hazard to public health and safety and is a continuous public nuisance that remains unabated.

96.

The Distributor Defendants intentionally continued their conduct, as alleged herein, with the knowledge that their conduct was creating the opioid nuisance and causing the harms and damages alleged herein.  In 2006 and 2007, the DEA issued multiple letters to the Distributor Defendants reminding them of their obligation to maintain effective controls against diversion of particular controlled substances, to design and operate a system to disclose suspicious orders, and to inform the DEA of any suspicious orders.

97.

Due to concerns about their addictive properties, opioids have been regulated at the federal level as controlled substances by the U. S. Drug Enforcement Administration

38

("DEA") since 1970.  They are a "Schedule II" drug and are categorized under federal and Louisiana law as dangerous drugs with a high potential for abuse which may lead to severe psychic or physical dependence.

98.

As manufacturers and/or distributors of controlled substances, each Manufacturer Defendant and each Distributor Defendant was required under the Louisiana Administration Code, Title 46, Part LIII § 2705(A) to obtain a Controlled Dangerous Substance License. Each Manufacturer Defendant and each Distributor Defendant, as a holder of a Controlled Dangerous Substance License, has the following duties: (1) to comply with all any federal or state laws or regulations relating to controlled substances, to provide effective controls and procedures to guard against theft or diversion of controlled substances;  (2) to design and operate  a system to disclose to the Manufacturer Defendant suspicious orders of controlled substances; (3) to inform the New Orleans Field Division Office of the DEA, or its successor, of suspicious orders, including orders of unusual size, orders deviating  substantially  from a  normal pattern, and orders of unusual frequency , when discovered by the Manufacturer Defendant;  (4) to maintain records and file reports; (5) to report whether missing controlled substances are likely candidates for diversion; and (6) to report local trends and other indicators of the diversion potential of missing controlled substances. Id. at §§ 2711, 2713, 2715(C)(2), 2731, 2737(0)(5&6).

99.

Each Distributor Defendant was further required to register with the DEA, pursuant to the federal Controlled Substance Act. See 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100.

Each Distributor Defendant is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme. Those requirements are adopted and incorporated into Louisiana law, as set forth above.

100.

Each Distributor Defendant has an affirmative duty under federal and Louisiana law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs.

101.

Federal law requires that Distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(b)(l). Louisiana incorporates these requirements, as set out above.

102.

Federal regulations, incorporated by Louisiana law, similarly impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registered distributor shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

103.

"Suspicious orders" include orders of an unusual size, orders of unusual

40

frequency, or orders deviating substantially from a normal pattern. See 21 CFR 1301.74(b). These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter, and the order should be reported as suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the entirety of the wholesale distributor's customer base, as well as the patterns throughout the relevant segment of the wholesale distributor industry.

104.

In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels. Regardless, all flagged orders must be reported.

105.

A distributor, in addition to reporting suspicious orders, has a responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels.

106.

Defendants have statutory and regulatory duties to maintain effective controls

41

against diversion, design and operate a system to disclose to the registrant suspicious orders of controlled substances, and to report suspicious orders.

107.

Notwithstanding their statutory and regulatory duties, each of the Distributor Defendants sold prescription opioids to retailers in the State of Louisiana, the Parish of Jefferson, and this judicial district, and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to and within the State of Louisiana, including the Parish of Jefferson and this judicial district.

108.

Each Distributor Defendant owes a duty to monitor and detect suspicious orders of prescription opioids; to investigate and refuse suspicious orders of prescription opioids; to report suspicious orders of prescription opioids; and, to prevent the diversion of prescription opioids into illicit markets in the State of Louisiana, including the Parish of Jefferson and this judicial district.

109.

The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction as well as abuse, addiction, morbidity, and mortality in State of Louisiana, including the Parish of Jefferson and this judicial district, and the damages caused thereby.

110.

The Distributor Defendants also failed to report to the federal and state authorities, including the DEA, suspicious orders originating from the State of Louisiana, including the Parish of Jefferson and this judicial district, or which the

42

Distributor Defendants knew were likely to be diverted to the State of Louisiana, the Parish of Jefferson, and this judicial district.

111.

The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern, and/or orders of unusual frequency in the State of Louisiana, including the Parish of Jefferson and this judicial district, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to the State of Louisiana, including the Parish of Jefferson and this judicial district.

112.

The Distributor Defendants breached their duty to monitor, detect, investigate, refuse, and report suspicious orders of prescription opiates originating from the State of Louisiana, including the Parish of Jefferson and this judicial district, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to the State of Louisiana, including the Parish of Jefferson and this judicial district.

113.

The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

114.

The Distributor Defendants breached their duty to design and operate a system to disclose to the registrant suspicious orders of controlled substances and failed to inform the authorities, including the DEA, of suspicious orders when discovered, in violation of their

duties under federal and state law.

115.

The Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific, and industrial channels.

116.

The Distributor Defendants' violations of public safety statutes constitute prima facie evidence of negligence under Louisiana law as well as constitutes negligence *per se*.

117.

The unlawful conduct by the Distributor Defendants is purposeful and intentional. The Distributor Defendants refuse to abide by the duties imposed by federal and state law that are required to legally acquire and maintain a license to distribute prescription opiates.

118.

In breaching their duties, the Distributor Defendants acted with actual malice, consciously disregarding the rights and safety of other persons.

119.

The Distributor Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities, demonstrate wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

44

120.

The Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under state and federal law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

121.

In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

122.

By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert. The Plaintiffs did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence. Meanwhile, the opioid epidemic rages unabated in the United States, in the State of Louisiana, in the Parish of Jefferson, and in this judicial district.

123.

The wrongful actions and omissions of the Distributor Defendants caused the diversion of opioids and are a substantial contributing factor to and/or proximate cause

of the opioid crisis.

124.

The Distributor Defendants abandoned their duties imposed under federal and state law, took advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances in the State of Louisiana, including the Parish of Jefferson and this judicial district.

125.

The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids incumbent upon the Distributor Defendants were also legally required of the Manufacturer Defendants under Louisiana and federal law.

126.

Under Louisiana and federal law, the Manufacturer Defendants were required to comply with substantially the same licensing and permitting requirements as the Distributor Defendants and the same rules regarding prevention of diversion and reporting suspicious orders.

127.

Like the Distributor Defendants, the Manufacturer Defendants were required to register with the DEA to manufacture the opioid Schedule II controlled substance.   See 21 U.S.C. § 823(a).  The registration requires:

> maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted supply of these substances under adequately competitive conditions for legitimate medical, scientific, research, and industrial purposes. 21 USCA §

46

823(a)(l) (emphasis added).

128.

Additionally, as "registrants" under Section 823, the Manufacturer Defendants were also required to monitor, report, and prevent suspicious orders of controlled substances:

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74. *See also* 21 C.F.R. § 1301.02 ("Any term used in this part shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter."); 21 C.F.R. § 1300.01 ("Registrant means any person who is registered pursuant to either section 303 or section 1008 of the Act (21 U.S.C. 823 or 958)."

129.

Each Manufacturer Defendant, like each Distributor Defendant, had duties under Louisiana Administration Code Title 46 as described above.

130.

Like the Distributor Defendants, the Manufacturer Defendants breached their duties under federal and state law.

131.

The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. Upon information and belief, the Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a

47

manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies for the manufacturer the product, volume, and the pharmacy to which it sold the product. Thus, the Manufacturer Defendants knew the volume, frequency, and pattern of opioid orders being placed and filled. The Manufacturer Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

132.

Federal statutes and regulations, and Louisiana law incorporating these requirements, are clear: opioid manufacturers are likewise required to "design and operate a system to disclose ... suspicious orders of controlled substances" and to maintain "effective controls against diversion." 21 C.F.R. § 1301.74; 21 U.S.C.A. § 823(a)(l).

133.

Through, *inter alia,* the data derived from the chargeback scheme, the Manufacturer Defendants could monitor suspicious orders of opioids.

134.

The Manufacturer Defendants failed to monitor, report, and halt suspicious orders of opioids as required by law.

135.

The Manufacturer Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful.

136.

The Manufacturer Defendants have misrepresented their compliance with federal and state law.

137.

The Manufacturer Defendants enabled the supply of prescription opioids to suspicious physicians and pharmacies, enabled the illegal diversion of opioids, aided criminal activity, and disseminated massive quantities of prescription opioids ultimately into the black market.

138.

The wrongful actions and omissions of Manufacturer Defendants have been a substantial contributing factor to and/or proximate cause of the opioid crisis and enabled the unlawful diversion of opioids into the State of Louisiana, including the Parish of Jefferson and this judicial district.

139.

As the Manufacturer Defendants' efforts to expand the market for opioids increased, so have the rates of prescription and sale of their products and the rates of opioid-related substance abuse, hospitalization, and death among the people of the State of Louisiana, the Parish of Jefferson and this judicial district. The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids into communities like Jefferson Parish and this judicial district, fueling the epidemic and crisis faced by Plaintiffs.

140.

There is a parallel relationship between the availability of prescription opioids through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes.

141.

Prescription opioids are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid addiction, overdoses and deaths. This problem has existed and continues to exist in the State of Louisiana, in the Parish of Jefferson, and in this judicial district.

142.

The epidemic is directly related to the increasingly widespread misuse of powerful opioid pain medications.

143.

The increased abuse of prescription painkillers along with growing sales has contributed to a large number of overdoses and deaths, including in the State of Louisiana, in the Parish of Jefferson, and in this judicial district.

144.

The opioid epidemic has escalated in the State of Louisiana, the Parish of Jefferson, and in this judicial district, with devastating effects such as widespread opiate-related substance abuse, hospitalization, and death that mirrors Defendants' increased distribution of opiates.

145.

The CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction.  People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin.[2]

146.

Heroin is pharmacologically similar to prescription opioids.  The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use.  Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use.[3]

147.

The CDC reports that drug overdose deaths involving heroin continued to climb sharply, with heroin overdoses more than tripling in four years.  This increase mirrors large increases in heroin use across the country and has been shown to be closely tied to opioid pain reliever misuse and dependence.  Past misuse of prescription opioids is the strongest risk for heroin initiation and use, specifically among persons who report past-year dependence or abuse.  The increased availability of heroin, combined with its relatively low price (compared with diverted prescription opioids) and high purity appear to be major drivers of the upward trend in heroin use and overdose.[4]

---

[2] https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.
[3] See Wilson M. Compton, *Relationship Between Nonmedical Prescription-Opioid Use and Heroin,* 374 N. Eng. J. Med. 154 (2016).
[4] See Rose A. Rudd, et al, Increases in Drug and Opioid Overdose Deaths—United States, 2000-2014, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016).

148.

Because of the well-established relationship between the use of prescription opiates and the use of non-prescription opioids, like heroin, the massive distribution of opioids to Jefferson Parish and areas from which such opioids are being diverted into Jefferson Parish has caused the hazards to public health and safety such as heroin addiction and heroin related crimes and deaths.

149.

Defendants repeatedly and purposefully breached their duties under state and federal law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes into the State of Louisiana, Jefferson Parish, and this judicial district.

150.

The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity, and mortality in the State of Louisiana, Jefferson Parish, and this judicial district. This diversion and the epidemic are direct causes of foreseeable harms incurred by Jefferson Parish.

151.

Defendants' intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages which Plaintiffs have incurred and continue to incur, including: (1) costs for providing treatment for individuals suffering from opioid-related addiction or disease; (2) costs for providing counseling and rehabilitation

services for individuals suffering from opioid-related addiction or disease; (3) criminal justice costs associated with the opioid epidemic to include the judicial system, prosecution, home incarceration costs, jail costs, jail medical costs, juvenile services, juvenile detention costs and juvenile detention medical costs; (4) judicial system costs and incarceration costs for opioid-related crime; (5) opioid related emergency room and/or hospital costs, ambulance, and fire service costs; (6) costs related to opioid and opioid-related overdoses and death investigations; (7) lost productivity costs due to employee absenteeism related to opioid addiction or disease; (8) any and all other costs and expenses incurred by Plaintiffs directly or indirectly due to Defendants' conduct. These damages have been suffered, and continue to be suffered, by the Plaintiffs. Plaintiffs also seek the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

152.

Plaintiffs seek economic damages from the Defendants as reimbursement for the costs associated with past, present, and future efforts to address, pay for and/or eliminate the aforementioned hazards to public health and safety.

153.

Plaintiffs also seek economic damages from the Defendants to pay for the cost to abate the epidemic created by Defendants' wrongful and/or unlawful conduct, and to permanently eliminate these hazards to public health and safety and abate the public nuisances caused thereby.

154.

To eliminate the hazard to public health and safety, and abate the public

nuisance, a multifaceted, collaborative public health and law enforcement approach is urgently needed. Such a comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients suffering pain.

155.

These community-based problems require community-based solutions that have been limited by budgetary constraints at the state and federal levels.

156.

Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their wrongful conduct has inflicted upon the Parish of Jefferson.

157.

The epic scale of the crisis ravaging the country has gotten too big to ignore. What was once considered a problem only amongst the rural poor now touches every demographic group, including those with historically low rates of drug use.

158.

The opioid epidemic is America's deadliest overdose crisis ever.  The most recent CDC data, from 2015, show the opioid death toll exceeded 33,000 that year.

159.

By comparison, more than 58,000 U.S. soldiers died in the entire Vietnam War, nearly 55,000 Americans died of car crashes at the peak of such deaths in 1972, more

than 43,000 died due to HIV/AIDS during that epidemic's peak in 1995, and nearly

40,000 died of guns during the peak of firearm deaths in 1993.

160.

Nevertheless, opioid sales overall totaled $8.6 billion and continue to rise,

according to data from Quintiles IMS Holdings, Inc.

**TOLLING AND FRAUDULENT CONCEALMENT**

161.

Plaintiffs contend they continue to suffer harm from the continual unlawful

actions by the Defendants.

162.

The continued tortious and unlawful conduct by the Defendants cause a repeated

or continuous injury.  The effects of Defendants' violative acts are cumulative. The

damages have not occurred all at once but have continued to occur after each violation

and have increased as time progresses. The harm is not completed nor have all the

damages been incurred until the wrongdoing ceases, and the wrongdoing and unlawful

activity by Defendants have by no means ceased or even decreased. The public nuisance

remains unabated.

163.

Defendants are equitably estopped from relying upon a statute of limitations or

prescription defense, to the extent any such defense even applies to Plaintiffs' claims,

because they undertook efforts to purposefully conceal their unlawful conduct and

fraudulently assure the public, including the State and the Parish of Jefferson, that they

were undertaking efforts to comply with their obligations under the state and federal

controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits.

164.

Upon information and belief, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Distributor Defendants, through their trade associations, not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations, neither of which assurance was true.

165.

Upon information and belief, the Distributor Defendants also concealed and prevented discovery of information, including data from the ARCOS database, which will confirm their identities and the extent of their wrongful and illegal  activities.

166.

The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Manufacturer Defendants invented "pseudo-addiction" and promoted it to an unsuspecting medical community. Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The medical community, consumers, the State of Louisiana, and the

Parish of Jefferson were duped by the Manufacturer Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the State of Louisiana, the Parish of Jefferson, and this judicial district.

167.

Defendants intended that their actions and omissions would be relied upon, including by Plaintiffs. Plaintiffs did not know and did not have the means to know the truth, due to Defendants' actions and omissions.

168.

The Plaintiffs reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

169.

Plaintiffs' claims are further subject to equitable tolling, including under the doctrine of contra non valentum, stemming from Defendants' knowingly and fraudulently concealing the facts alleged herein.

170.

The purposes of the statutes of limitations and prescription periods are satisfied because Defendants cannot claim prejudice due to a late filing where the Plaintiffs filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed and continue to effort to conceal.

171.

In light of their statements to the media, in legal filings, and settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

172.

Defendants continually and secretly engaged in their scheme to avoid compliance  with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, the Plaintiffs have been unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its  part.

## LEGAL CAUSES OF ACTION

## COUNT I - VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT PURSUANT TO 18 U.S.C. § 1961, *et seq.*

173.

Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows.

174.

Plaintiffs bring this Count against the following Defendants as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants").

175.

Through Defendants' actions and inactions, including but not limited to Defendants' violations and/or breaches of the statutes, regulations, and duties described herein,  Defendants have maintained, directly and/or indirectly, an interest in or control of a RICO *enterprise* of individuals and/or organizations who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce,

all in violation of 18 U.S.C. § 1961, *et seq.*

176.

The Defendants did cooperate jointly and severally in the commission  of two
(2) or more of the RICO predicate acts described herein and that are itemized in the
RICO laws, and did so in violation of the RICO law at 18 U.S.C. 1962(b). During this
time, Defendants also associated with a RICO enterprise of individuals who were
associated in fact and who engaged in, and whose activities did affect, interstate and
foreign commerce.

177.

Likewise, the Defendants did conduct and/or participate, either directly or
indirectly, in the conduct of the affairs of said aforementioned RICO enterprise
through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1961, *et
seq.*

178.

Plaintiffs further allege that all Defendants did commit two (2) or more of the
offenses itemized herein in a manner which they calculated and premeditated
intentionally to threaten continuity, i.e. a continuing threat of their respective
racketeering activities, also in  violation  of the RICO law at 18 U.S.C. § 1962(c) *et seq.*

**COUNT II - CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED
AND CORRUPT ORGANIZATIONS ACT PURSUANT TO 18 U.S.C. § 1961, *et seq.***

179.

Plaintiffs repeat and re-allege each and every allegation of the foregoing
paragraphs as if fully set forth herein, and specifically repeats and re-alleges the

allegations under the First Cause of Action concerning RICO liability.

180.

Based on the aforementioned acts and inactions, Defendants did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961, *et seq*.

181.

All Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. § 1962(d).

182.

Plaintiffs further allege that Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § 1962(d) (prohibited activities).

## COUNT III - PUBLIC NUISANCE

183.

Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

184.

Defendants' unlawful actions have created a public nuisance under Louisiana law, and Plaintiffs bring an action for abatement of that nuisance. *See* La.R.S. 13:4712 (granting Jefferson Parish's governing authority the right to petition for injunction or order of abatement); La. R.S. 471l(A)(4)(b) (The illegal manufacture, sale or distribution of, or

possession with intent to manufacture, sell, or distribute, a controlled dangerous substance as defined by R.S. 40:961 or of drug paraphernalia as defined by R.S. 40: 1021.).

185.

Plaintiffs allege that Defendants' wrongful and illegal actions have created a public nuisance and that each Defendant is liable for public nuisance.

186.

Defendants intentionally, unlawfully, recklessly, and negligently manufacture, market, distribute, and sell prescription opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to Jefferson Parish, resulting in addiction and abuse, an elevated level of crime, injuries and death to the residents of Jefferson Parish, a higher level of fear, discomfort and inconvenience to the residents of Jefferson Parish, and thereby direct costs to Jefferson Parish.

187.

Defendants have unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion. Such conduct was illegal. Defendants' failures to maintain effective controls against diversion include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

188.

Defendants' conduct in unlawfully distributing and selling prescription opioids, or causing such opioids to be distributed and sold, when Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used

unlawfully in the State of Louisiana, including within the Parish of Jefferson and this judicial district, is of a continuing nature.

189.

Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

190.

A violation of any rule or law controlling the distribution of a drug of abuse in Jefferson Parish and the State of Louisiana is a public nuisance.

191.

Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by federal and state law.

192.

Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be unlawfully distributed and possessed in the State of Louisiana and in Jefferson Parish will be diverted, leading to abuse, addiction, crime, and public health costs.

193.

Because of the continued use and addiction caused by these unlawfully distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

194.

Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free  from disturbance and reasonable apprehension of danger to person and property.

195.

Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in Jefferson Parish. Defendants are in the business of manufacturing, marketing, selling, and distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under federal law.

196.

Defendants' conduct in marketing, distributing, and selling prescription opioids which the defendants know, or reasonably should know, will likely be diverted for non-legitimate, non- medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to residents in Jefferson Parish and otherwise significantly and unreasonably interfere with public health, safety, and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

197.

It was reasonably foreseeable to Defendants that their conduct will cause deaths and injuries  to residents in Jefferson Parish, and will otherwise significantly and unreasonably interfere with public health, safety, and welfare, and with the public's right

to be free from disturbance and reasonable apprehension of danger to person and property.

198.

The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in Jefferson Parish not only causes deaths and injuries, but also creates a palpable climate of fear among residents in Jefferson Parish where opioid diversion, abuse, and addiction are present and where diverted opioids tend to be used frequently.

199.

Stemming the flow of illegally distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make Jefferson Parish a safer place to live, work and raise families.

200.

Defendants' conduct is a direct and proximate cause of deaths and injuries to the residents of Jefferson Parish, costs borne by Jefferson Parish, and a significant and unreasonable interference with public health, safety, and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

201.

Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety, and welfare of the residents of Jefferson Parish, creating an atmosphere of fear and addiction that tears at the residents'

64

quality of life.  Plaintiff, the Parish of Jefferson, has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

202.

Defendants created this nuisance of the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in Jefferson Parish, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting, and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids, or caused such orders to be shipped. Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading. Such actions were inherently dangerous.

203.

Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids or caused such opioids to be distributed without maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance in Jefferson Parish.

204.

Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

205.

As a direct result of Defendants' conduct, the Parish of Jefferson has suffered actual injury and damages including, but not limited to, significant expenses for prosecution, judicial and criminal justice costs, juvenile services and detention and both juvenile detention and jail related medical expenses, emergency services, health services, other services and costs related to opioid addiction treatment and overdose prevention.

206.

The Plaintiffs further seek to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions.

207.

The public nuisance created by Defendants' actions is substantial and unreasonable, it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the Defendants' abdication of their gate-keeping and diversion prevention duties, and the Manufacturer Defendants' fraudulent marketing activities, have caused harm to the Parish of Jefferson.

208.

Plaintiffs seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory, treble, and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT IV

## VIOLATIONS OF LOUISIANA RACKETEERING ACT
## (LSA-R.S. 15:1351 *et seq.*)

209.

Plaintiffs incorporate by reference all other paragraphs of this Petition as if fully set forth herein, and further alleges as follows.

210.

Plaintiffs bring this Count on behalf of itself against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants").

211.

RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise. At all relevant times, the RICO Defendants operated as an association in fact and included unlawful as well as lawful enterprises as defined by

67

LSA-R.S. § 15:1352(8).

212.

Section 15:1353 makes it "unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity" and it is unlawful for any person to "conspire or attempt to violate any of the provisions" of LSA-R.S. 15:1353.

213.

The term "enterprise" is defined as including "any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities." LSA-R.S. 15:1352(8).

214.

For over a decade, the RICO Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, RICO Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. Yet, to do just that, the RICO Defendants violated their duties: (1) to comply with all any federal or state laws or regulations relating to controlled substances, to provide effective controls and procedures to guard against theft or diversion of controlled substances; (2) to design and operate a system to disclose to the Manufacturer Defendant suspicious orders of controlled substances; (3) to inform the New Orleans Field Division Office of the DEA, or its successor, of suspicious orders, including orders of unusual size, orders

deviating substantially from a normal pattern, and orders of unusual frequency, when discovered by the Manufacturer Defendant; (4) to maintain records and file reports; (5) to report whether missing controlled substances are likely candidates for diversion; and (6) to report local trends and other indicators of the diversion potential of missing controlled substances.

215.

Federal and Louisiana law governing the manufacture and distribution of Schedule II substances was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from legitimate channels of trade to the illicit market by controlling the quantities of the basic ingredients needed for the manufacture of controlled substances.

216.

Finding it impossible to legally achieve their ever increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders. As discussed in detail below, through the RICO Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers that, in turn, artificially and illegally increased the annual production quotas for opioids allowed by the DEA. In doing so, the RICO Defendants allowed hundreds of millions of pills to enter the illicit market that allowed them to generate obscene profits.

217.

Defendants' unlawful scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants, and executed in perfect harmony by them. In particular, the RICO Defendants were associated with, and conducted or participated in, the affairs of the RICO enterprise (defined below and referred to collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in the unlawful sales of opioids, deceive the public and federal and state regulators into believing that the RICO Defendants were faithfully fulfilling their statutory obligations. The RICO Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share.  As a direct result of the RICO Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while entities like the Plaintiffs experienced tens of millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription  opioid addiction  epidemic. As explained in detail below, the RICO Defendants' misconduct violated R.S. 14:67 (Theft), R.S. 40:967(A) (Manufacture; distribution of Schedule II controlled dangerous substances), R.S. 14:230 (Money laundering), R.S. 14:133 (Filing or maintaining false public records), and  14:70:1 (Medicaid fraud), and Plaintiffs are entitled to treble damages for its injuries under LSA-R.S. 15:l 356(E).

218.

Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of LSA-R.S. § 15:1352 through which the RICO Defendants conducted their pattern of racketeering activity in the State of Louisiana, including within the Parish of Jefferson and this judicial district. Specifically, the Healthcare Distribution Alliance (the "HDA") is a distinct legal entity that satisfies the definition of a RICO enterprise. The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia. As a non-profit corporation, HDA qualifies as an "enterprise" because it is a corporation and a legal entity.

219.

On information and belief, each of the RICO Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Enterprise and  to engage in the pattern of racketeering activity that gives rise to the Count.

220.

Each of the RICO Defendants is a legal entity separate and  distinct from the HDA. The HDA serves the interests of distributors and manufacturers beyond the RICO Defendants. Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the RICO Defendants exists separately from the HDA. Therefore, the HDA may serve as a RICO enterprise.

221.

The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the

Opioid Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

### The Opioid Diversion Enterprise

222.

It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (I) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.

223.

At all relevant times, the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their statutory duty to identify, investigate, halt, and report suspicious orders of opioids and diversion of their drugs into the illicit market, in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The RICO Defendants conducted their pattern of racketeering activity throughout the United States, including with the State of Louisiana, Jefferson Parish, and this judicial district, through this enterprise.

224.

The Opioid Diversion Enterprise was and is a shockingly successful endeavor. The Opioid Diversion Enterprise has been conducting business uninterrupted since its genesis. But, it was not until recently that United States and State regulators finally began

to unravel the extent of the enterprise and the toll that it exacted on the American public.

225.

At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production quotas, all so that the RICO Defendants would have a larger pool of prescription opioids from which to profit.

226.

The Opioid Diversion Enterprise functioned by selling prescription opioids. While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants, through their unlawful enterprise, engaged in a pattern of racketeering activity, that involves a fraudulent scheme to increase revenue by violating state and federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug market. The goal of Defendants' scheme was to increase profits from opioid sales. But, Defendants' profits were limited by

the production quotas set by the DEA, so the Defendants refused to identify, investigate and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market. The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

227.

Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

228.

Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities. The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

229.

The RICO Defendants exerted substantial control over the Opioid Diversion

Enterprise by their membership in the Pain Care Forum, the HDA, and through their contractual relationships.

230.

Not surprisingly, each of the RICO Defendants who stood to profit from fraudulently promoting prescription opioid use is a member of and/or participant in the PCF. At pertinent times, membership and participating organizations included the HDA (of which all RICO Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company for Janssen Pharmaceuticals), Actavis (i.e., Allergan), and Teva (the parent company of Cephalon). Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. But, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA. Plaintiffs are informed and believe that the Distributor Defendants participated directly in the PCF as well.

231.

The Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drug makers and their allies whose sole purpose was to shape the national response to the ongoing prescription opioid epidemic, including the concerted efforts that the PCF undertook on behalf of its members.

232.

Second, the HDA - or Healthcare Distribution Alliance - led to the formation of interpersonal relationships and an organization between the RICO Defendants.

75

Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the Complaint, including Actavis (i.e., Allergan), Endo, Purdue, Mallinckrodt and Cephalon were members of the HDA. And, the HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturers and Distributors at high executive levels.

233.

In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference, network with HDA wholesale distributor members, host and sponsor HDA Board of Directors events, participate on HDA committees, task forces and working groups with peers and trading partners, and make connections. Membership in the HDA created interpersonal and ongoing organizational relationships between the Manufacturers and Defendants.

234.

The councils, committees, task forces and working groups of the HDA provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

235.

Third, the RICO Defendants maintained their interpersonal relationships by working together and exchanging information and driving the unlawful sales of their opioids through

their contractual relationships, including chargebacks and vault security programs.

236.

The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids. There exists an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or chargebacks on their prescription opioid sales. On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices. The Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell the prescription opioids.

237.

The contractual relationships among the RICO Defendants also include vault security programs. The RICO Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opiates. Upon information and belief, the Manufacturer Defendants negotiated agreements whereby the Manufacturer Defendants installed security vaults for Distributors in exchange for agreements to maintain minimum  sales performance thresholds. Upon information and belief, these agreements were used by the RICO Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

238.

Taken together, the interaction and length of the relationships between and among the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry. The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The RICO Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care Forum are but two examples of the overlapping relationships, and concerted joint efforts to accomplish common goals and demonstrates that the leaders of the RICO Defendants were in communication and cooperation.

239.

As described above, the RICO Defendants began working together as early as 2006 through the Pain Care Forum and/or the HDA to promote the common purpose of their enterprise. Upon information and belief, the RICO Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

## Conduct of the Opioid Diversion  Enterprise

240.

At all times pertinent, the RICO Defendants exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by fraudulently failing to comply with their Federal and State obligations to identify, investigate, and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, to halt such unlawful sales and, in doing so, to increase production quotas and generate

unlawful profits.

241.

Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

242.

Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

243.

Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

244.

The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

245.

The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Upon information and belief, the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured. And, upon information and belief, the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger

volumes.

246.

The Manufacturer Defendants deceived the DEA to increase Aggregate Production Quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the RICO Defendants.

247.

The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007 was intended to help the RICO Defendants identify suspicious orders or customers who were likely to divert prescription opioids. On information and belief, the "know your customer" questionnaires informed the RICO Defendants of the number of pills that the pharmacies sold, how many non- controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

248.

The RICO Defendants refused to identify, investigate and report suspicious orders to the DEA when they became aware of the suspicious orders despite their actual knowledge of drug diversion rings. The RICO Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants for failure to report suspicious orders.

249.

Defendants' scheme had a decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion, and identify suspicious orders and report them to the DEA.

250.

The RICO Defendants worked together to ensure that the Aggregate Production Quotas, Individual Quotas, and Procurement Quotas allowed by the DEA stayed high and ensured that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no basis for refusing to increase or decrease the production quotas for prescription opioids due to diversion of suspicious orders.

251.

The scheme devised and implemented by the RICO Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

**COUNT V**

**(FRAUD)**

252.

Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

### 253.

Defendants, as detailed hereinabove, made numerous fraudulent misrepresentations.

### 254.

Defendants, as detailed hereinabove, engaged in repeated fraudulent acts and practices, thus committing fraud against Plaintiffs, pursuant to Louisiana Civil Code article 2315 (as defined in Louisiana Civil Code article 1953).

## COUNT VI

## (NEGLIGENT MISREPRESENTATION)

### 255.

Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

### 256.

For reasons set forth above, Defendants made negligent misrepresentations to Plaintiffs and others pursuant to Louisiana Civil Code articles 2315 and 2316. There existed at all relevant times a legal duty owed to Plaintiffs by Defendants to accurately warn of the efficacy and side effects of opioid analgesic pain relievers. Defendants breached this duty as set forth above. Plaintiffs reasonably relied upon Defendants' representations. As an actual and proximate result of Defendants' misrepresentations, and Plaintiffs reasonable reliance thereof, Plaintiffs have been

damaged as detailed above.

257.

Plaintiffs are entitled to judgment against Defendants for restitution, attorney's fees and costs for the losses incurred as a direct and proximate cause of Defendants' misrepresentations.

**COUNT VII**

**(REDHIBITION)**

258.

Plaintiffs incorporate by reference all previous allegations  in the preceding paragraphs  as if fully set forth herein.

259.

Pursuant to Louisiana Civil Code 2520, *et seq.,* through the manufacture, marketing, and sale of OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone and Norco, Defendants warranted to the Plaintiffs, Louisiana patients, medical assistance programs and government payors (including Plaintiffs) that OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq,  Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and  Norco were free of any redhibitory defects.

260.

By virtue of the acts alleged above, Defendants had reason to know that Plaintiffs, patients, their insurers, public health care providers, prescribers, public entities, medical assistance programs and government payers (including Plaintiffs) were purchasing and

83

using OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco for the treatment of unapproved indications or for ineffective treatment. Therefore, pursuant to  La. C.C. art. 2520, Defendants warranted to the Plaintiffs, Louisiana patients, their insurers,  public health care providers, prescribers, public entities, medical assistance programs and government payors that OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla  ER,  and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan,  Zydone,  Kadian, oxycodone, hydrocodone, and Norco were for those particular purposes.

261.

OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco contain redhibitory defects    unknown    and undiscoverable  to  Plaintiffs but for Defendants' false representations and omissions regarding unapproved indications and uses for OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco, Louisiana healthcare professionals would not  have  prescribed OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone,  Kadian,  oxycodone, hydrocodone, and Norco for such unapproved indications and uses, and consequently, Plaintiffs would not have purchased and/or paid for OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER,

Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco.

262.

The redhibitory defects existed at the time OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco were purchased and/or paid for by Plaintiffs, and Plaintiffs had no knowledge of the redhibitory defects when it paid for OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco and it could not have reasonably discovered the hidden redhibitory defects in OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco.

263.

Defendants breached their warranty of redhibition and as a direct result of this breach of warranty, Plaintiffs have suffered and will continue to suffer damages.

264.

Pursuant to La. C.C. art. 2545, Defendants are liable to Plaintiffs for the return of the price with interest from the time it was paid for, reimbursement of the reasonable expenses occasioned by the sale, and for damages, including any consequential damages for medical care and expenses related to the undisclosed adverse effects and side effects of OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targinio, ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian,

oxycodone, hydrodone, and Norco in a total amount to be determined at trial, as well as reasonable attorney fees to be set by the Court.

## COUNT VIII

## (UNJUST ENRICHMENT)

265.

Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

266.

Alternatively, Plaintiffs assert that by receiving recoveries for overpayments/overcharges for prescriptions which were ultimately paid for by the Parish of Jefferson, Defendants have been enriched without cause at the expense of Plaintiffs. Pursuant to Louisiana Civil Code article 2298, Defendants are obligated to restore Plaintiffs the portion of any payments for OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco, opioid analgesic pain relievers attributable to prescriptions ultimately paid for by Jefferson Parish.

267.

It would be inequitable for Defendants to be permitted to retain any of the overcharges for OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, Percocet, Actiq, Fentora, Duragesic, Opana/Opana ER, Percodan, Zydone, Kadian, oxycodone, hydrocodone, and Norco, opioid analgesic pain relievers, derived from Defendants' unfair and unconscionable methods, acts, and trade practices

alleged in this Petition.

268.

To the extent that Plaintiffs have no adequate remedy at law, Defendants should be compelled to disgorge for the benefit of Plaintiffs all unlawful or inequitable proceeds received by Defendants.

269.

Plaintiffs allege that under La. C.C. art. 2298, Defendants have been unjustly enriched and, thus, Plaintiffs are entitled to an award for costs, expenses, fees, and attorney fees.

## **COUNT** IX

## **(UNFAIR TRADE PRACTICES)**

270.

Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

271.

Defendants, have engaged in actions, as described above, which are unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and to the public.

272.

The acts and omissions of Defendants, as enumerated above, constitute unfair or deceptive acts or practices in the conduct of trade or commerce which have been declared unlawful by Louisiana statutes and jurisprudence.

273.

Defendants are thus in violation of The Louisiana Unfair Trade Practices Act, La.

R.S. 51:1401, *et.seq.*

## DAMAGES

274.

The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property because Plaintiffs paid for costs associated with the opioid epidemic, as described above in language expressly incorporated herein by reference. Plaintiffs' injuries were directly and/or proximately caused by Defendants' racketeering activities. But for the RICO Defendants' conduct, Plaintiffs would not have paid the health services and judicial and criminal justice expenditures required as a result of the plague of drug-addicted residents. Plaintiffs were most directly harmed and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here. Plaintiffs seek all legal and equitable relief as allowed by law, including *inter alia* actual damages (as described above in language expressly incorporated herein by reference), treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

275.

Defendants' intentional and/or unlawful conduct, as described herein, resulted in direct and foreseeable, past and continuing, economic damages which Plaintiffs have incurred and continues to incur, including: (1) costs for providing treatment for individuals suffering from opioid-related addiction or disease; (2) costs for providing counseling and rehabilitation services for individuals suffering from opioid-related addiction or disease; (3) criminal justice costs associated with the opioid epidemic to include the judicial system, prosecution, home incarceration costs, jail costs, jail

medical costs, juvenile services, juvenile detention costs and juvenile detention medical costs; (4) judicial system costs and incarceration costs for opioid-related crime; (5) opioid related emergency room and/or hospital costs, ambulance, and fire service costs; (6) costs related to opioid and opioid related overdoses and death investigations; (7) lost productivity costs due to employee absenteeism related to opioid addiction or disease; (8) any and all other costs and expenses incurred by Plaintiffs directly or indirectly due to Defendants' conduct.  These damages have been suffered, and continue to be suffered, by the Plaintiffs.

Plaintiffs also seek the means to abate the epidemic (created by  Defendants' wrongful and/or unlawful conduct), including but not limited to economic damages from the Defendants as reimbursement for the costs associated with past, present, and future efforts to address, pay for, and/or eliminate the aforementioned hazards to public health and safety.

276.

Plaintiffs have incurred and seek economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' actions and omissions, including all counts alleged against Defendants. Plaintiffs do not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

277.

Other than such damages specifically disavowed herein, Plaintiffs seek all legal and equitable relief as allowed by law (for all counts alleged against Defendants), including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory, treble and punitive

damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

278.

In accordance with Louisiana Civil Code Article 2324, all Defendants are solidarily liable.

279.

Plaintiffs demand a jury trial on all issues so triable.

WHEREFORE, Plaintiffs pray that summons issue notifying Defendants of this Complaint, and that after all legal delays, Defendants be required to answer same, and after all proceedings and a jury trial, there be a judgment in favor of Plaintiffs for all amounts commensurate with Plaintiffs' damages including but not limited to: (1) costs for providing treatment for individuals suffering from opioid-related addiction or disease; (2) costs for providing counseling and rehabilitation services for individuals suffering from opioid-related addiction or disease; (3) criminal justice costs associated with the opioid epidemic to include the judicial system, prosecution, home incarceration costs, jail costs, jail medical costs, juvenile services, juvenile detention costs and juvenile detention medical costs; (4) judicial system costs and incarceration costs for opioid-related crime; (5) opioid related emergency room and/or hospital costs, ambulance, and fire service costs; (6) costs related to opioid and opioid-related overdoses and death investigations; (7) lost productivity costs due to employee absenteeism related to opioid addiction or disease; (8) any and all other costs and expenses incurred by Plaintiffs directly or indirectly due to Defendants' conduct. These damages have been suffered, and continue to be suffered, by the Plaintiffs. Plaintiffs

also seek the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

For the RICO violations, an award of trebled damages as consistent with 18 U.S.C. § 1964(c) and/or Louisiana's RICO law, compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-judgement interest, and costs against Defendants, each and every one of them jointly and severally, and any additional amount that this Court deems just and proper.

Respectfully submitted this 29th day of June, 2018.

_/S/ Deborah A. Villio_
DEBORAH A. VILLIO (#19352)
MICHAEL L. FANTACI (#25043)
LEBLANC FANTACI VILLIO, LLC
3421 N. Causeway Blvd., Ste. 201
Metairie, LA 70002
Tel.: (504) 828-1010
Fax: (504) 828-1079
E-mail: dvillio@lfvlaw.us
E-mail: mfantaci@lfvlaw.us


s/ Thomas P. Anzelmo
THOMAS P. ANZELMO (#2533)
LAUREN A. WELCH (#17199)
McCRANIE, SISTRUNK, ANZELMO, HARDY, McDANIEL & WELCH, L.L.C.
909 Poydras Street, Suite 1000
New Orleans, LA 70112
Telephone: (504) 831-0946
Facsimile: (800) 977-8810
E-mail: tanzelmo@mcsalaw.com
E-mail: lwelch@mcsalaw.com


s/ J. Christopher Zainey, Jr.
**J. CHRISTOPHER ZAINEY, JR. (#32022)**

HUBER, SLACK THOMAS & MARCELLE, LLP
1100 Poydras Street, Suite 2200
New Orleans, LA 70163
Phone: (504)274-2500
Fax: (504)910-0838
chris@huberslack.com


**THE GREEN LAW FIRM**

s/ *Marcus A. Green*
**Marcus A. Green (#28921)**
931 Westwood Dr.
Suite B
Marrero, LA 70072
Telephone: (504) 328-3990
Fax:  (504) 328-3992
mag@greenlawfirmla.com


BERRIGAN LITCHFIELD, LLC


*/s/ E. John Litchfield*
_____
E. JOHN LITCHFIELD (Bar Roll No. 08622)
201 St. Charles Avenue, Suite 4204
New Orleans, Louisiana  70170
Telephone:  (504) 568-0541
Facsimile:  (504) 561-8655
Email:  jlitchfield@berriganlaw.net

## CERTIFICATION

By presenting this Complaint to this Honorable Court, the undersigned certifies that to the best of the undersigned's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, and legal contentions are warranted by existing law or by a non-frivolous argument for  extending, modifying, or reversing existing law or for establishing new law; and (3) the factual contentions have evidentiary support.

Filed this 29th day of June, 2018.

_/S/ Deborah A. Villio_
DEBORAH A. VILLIO (#19352)
MICHAEL L. FANTACI (#25043)
LEBLANC FANTACI VILLIO, LLC
3421 N. Causeway Blvd., Ste. 201
Metairie, LA 70002
Tel.: (504) 828-1010
Fax: (504) 828-1079
E-mail:  dvillio@lfvlaw.us
E-mail:  mfantaci@lfvlaw.us


s/ Thomas P. Anzelmo
THOMAS P. ANZELMO (#2533)
LAUREN A. WELCH (#17199)
McCRANIE,    SISTRUNK,    ANZELMO,
HARDY, McDANIEL & WELCH, L.L.C.
909 Poydras Street, Suite 1000
New Orleans, LA 70112
Telephone: (504) 831-0946
Facsimile: (800) 977-8810
E-mail:  tanzelmo@mcsalaw.com
E-mail:  lwelch@mcsalaw.com

_s/ J. Christopher Zainey, Jr._

**J.  CHRISTOPHER ZAINEY, JR. (#32022)**
HUBER, SLACK THOMAS & MARCELLE, LLP
1100 Poydras Street, Suite 2200
New Orleans, LA 70163
Phone: (504)274-2500
Fax: (504)910-0838
chris@huberslack.com


**THE GREEN LAW FIRM**

_s/ Marcus A. Green_
**Marcus A. Green (#28921)**
931 Westwood Dr.
Suite B
Marrero, LA 70072
Telephone: (504) 328-3990
Fax:  (504) 328-3992
mag@greenlawfirmla.com


BERRIGAN LITCHFIELD, LLC


_/s/ E. John Litchfield_
_____
E. JOHN LITCHFIELD (Bar Roll No. 08622)
201 St. Charles Avenue, Suite 4204
New Orleans, Louisiana  70170
Telephone:  (504) 568-0541
Facsimile:  (504) 561-8655
Email:  jlitchfield@berriganlaw.net

94